[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10570

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 4, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00025-CV-JTC-3

D'ANNA BATES,
GARY BATES,

Plaintiffs-Appellees,

versus

DEPUTY LEE HARVEY,

Defendant-Appellant,

SHERIFF JIMMY THOMAS,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 4, 2008)**

Before TJOFLAT, HULL and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Lee Harvey, a deputy sheriff with the Pike County, Georgia Sheriff's Department ("Deputy Harvey"), appeals the denial of his motion for summary judgment based on qualified immunity. In her 42 U.S.C. § 1983 suit, Plaintiff D'Anna Bates ("Mrs. Bates") claims that Deputy Harvey falsely arrested her after entering her home without a warrant to search for the subject of a civil commitment order, in violation of the Fourth and Fourteenth Amendments.[1] The district court concluded that Deputy Harvey was not entitled to qualified immunity because Mrs. Bates established that neither consent nor exigent circumstances justified Deputy Harvey's warrantless entry, search, and arrest in her home under then-clearly established law. Although we agree that Deputy Harvey deprived Mrs. Bates of her constitutional rights, we nonetheless conclude that Deputy Harvey is entitled to qualified immunity on Mrs. Bates's false arrest claim because at the time he acted, the law did not give a reasonable officer fair and clear

---

[1] Mrs. Bates and her husband, Gary Bates, were co-plaintiffs in this action. Mrs. Bates presented a number of claims under 42 U.S.C. § 1983 and Georgia state law, including allegations of false arrest on March 21, 2003, and April 2, 2003; excessive force related to her March 21, 2003 arrest; First Amendment retaliation; and malicious prosecution. Gary Bates asserted a claim for loss of consortium under Georgia state law, over which the district court exercised supplementary jurisdiction pursuant to 28 U.S.C. § 1367(a). The district court granted Deputy Harvey's motion for summary judgment on all claims, except the March 21, 2003 false arrest claim. At this stage—an interlocutory appeal of a denial of qualified immunity—neither Mrs. Bates nor Gary Bates appeals the district court's order granting summary judgment with respect to these other claims.

2

warning that a civil commitment order does not present circumstances sufficiently exigent to excuse the warrantless entry and search of an unrelated third party's home. Accordingly, we reverse the district court's denial of Deputy Harvey's motion for summary judgment on qualified immunity grounds and remand this case back to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND[2]

On the morning of March 21, 2003, Mark and Wanda Wilson went before the Probate Court of Upson County, Georgia to request a civil commitment order for their 17-year old son, "J.T." They presented the court with a form affidavit supporting their request. By checking off the applicable boxes, the Wilsons alleged in the form affidavit that based on what they both had observed in the preceding 48 hours, J.T. was an alcoholic and drug dependent who required involuntary treatment and "who present[ed] a substantial risk of imminent harm to himself or others as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to himself or to

_____

[2] Because we review the denial of defendant's motion for summary judgment, we draw the facts from the pleadings, supporting affidavits, and depositions and view them in the light most favorable to the plaintiff. *Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

3

other persons . . . ." DMSJ (Exh. 1 at 1-2).[3] In addition to the form affidavit, Mark Wilson told the court that "his son is a drug abuser [who] will not go to school, work[;] he says he does [not] care about anything." *Id.* at 5. Wanda Wilson stated that "her son needs help before he hurts himself or someone else." *Id.* The parents' sworn statements were recorded onto the last page of the affidavit, followed by form language stating that, "[t]he condition is so serious that he/she should be examined forthwith at an Emergency Receiving Facility according to law." *Id.* The affidavit set forth the parents' home as the young man's address. Based on the form affidavit, the Probate Court issued a civil commitment order to any peace officer in Upson County to take J.T. into custody and deliver him to West Central Georgia Regional, an emergency receiving facility. The Probate Court's order did not make any finding as to J.T., but simply recited the affidavits on file in the probate office alleging that J.T. presented a substantial risk of imminent harm to himself or others.

Sergeant David Walker ("Sergeant Walker") of the Upson County Sheriff's Office was charged with executing the civil commitment order later that morning. After the Probate Court issued the order, Wanda Wilson verbally informed Sergeant Walker that J.T. might be found at his friend's house, and she gave the

---

[3] "DMSJ" refers to Defendant's Motion for Summary Judgment and supporting exhibits.

officer an address in Pike County, Georgia. Sergeant Walker requested assistance from the Pike County Sheriff's Office, and Deputy Harvey agreed to help execute the commitment order by driving to the address with Sergeant Walker following in his own patrol car. Before heading out to the address, Deputy Harvey reviewed the civil commitment order and the attached form affidavit, which was eventually left in Sergeant Walker's patrol car. Sergeant Walker told Deputy Harvey that they were traveling to the Pike County address because J.T.'s mother believed that her son was spending the night at his friend's house. Both officers knew they were going to a third party's home to look for J.T.; neither officer attempted to obtain a search warrant.

Shortly after 9 a.m., Mrs. Bates's 14-year-old step-daughter, "S.B.," answered the officers' knock on the back door to the Bates residence. The officers asked S.B. if J.T. was in the house, and she told them that he wasn't.[4] The officers then asked who else was present in the house, and before S.B. could answer, the officers asked if they could come in and search the house. When S.B. responded "I don't know," the officers walked inside. Deputy Harvey and Sergeant Walker immediately proceeded to the hallway where the bedrooms were located and

---

[4] Although J.T. was indeed present at the Bates home, he testified that he had snuck in through a bedroom window late the night before.

opened the door to the bedroom where Mrs. Bates's 18-year-old step-daughter, "H.B.," was lying in bed. The officers asked H.B. whether J.T. was in the house, and she responded that she didn't know. H.B. testified that the officers then asked if they could look around, to which she replied "something to the effect of I guess so." H.B. Dep. at 7-8. The officers proceeded to another bedroom belonging to Mrs. Bates's 19-year-old son, "C.L.," where they found C.L. and J.T. asleep. The officers woke up the two boys and Sergeant Walker stood by as J.T. dressed. Both young men followed the officers' directions.

From her bathroom, Mrs. Bates heard a male voice she did not recognize shouting, "Is this you? Is this you?" Hearing loud voices and banging, Mrs. Bates came out of her bedroom to investigate. She immediately saw Deputy Harvey standing at C.L.'s doorway, yelling at C.L. and demanding to know if the license found on a dresser belonged to him. Mrs. Bates demanded to see a search warrant, and Deputy Harvey replied that he had a court order. Mrs. Bates asked to see the order. Rather than produce the civil commitment order, however, Deputy Harvey tried to explain how the commitment order authorized the officers to enter her home. Mrs. Bates insisted that the officers must leave her house immediately if they could not show her a search warrant. Deputy Harvey told Mrs. Bates that Sergeant Walker left the civil commitment order in his patrol car, but neither

6

officer made any attempt to retrieve the order. Deputy Harvey warned Mrs. Bates that he would arrest her for obstruction of justice if she continued to impede the officers' execution of the civil commitment order.

The verbal exchange between Deputy Harvey and Mrs. Bates continued for about a minute, with Mrs. Bates demanding that the officers show her a search warrant or leave her home. Deputy Harvey suddenly approached Mrs. Bates, grabbed her hand, and twisted her arm around to her back until she fell to the floor as he attempted to place her in handcuffs. One handcuff caught onto his watch, forcing Deputy Harvey to release Mrs. Bates, who ran to the bathroom. Before she could close the bathroom door, Deputy Harvey reached Mrs. Bates, grabbed her by the shoulder, spun her around and struck her in the face. Mrs. Bates fell to the floor. Deputy Harvey grabbed Mrs. Bates by her feet and dragged her across the bathroom floor out into the hallway, while she screamed and kicked, trying to escape. While her children stood by watching the scene unfold, Sergeant Walker joined in, putting his knee into Mrs. Bates's back as he and Deputy Harvey pulled her arms in opposite directions. At this moment Gary Bates entered the front door to find the two officers pinning his wife face-down on the floor.

When the officers saw Gary Bates, they stood up, one on each side of Mrs. Bates, and lifted her from the floor while still holding on to her arms. As they

stood, Deputy Harvey glanced out the window and saw J.T. running across the field behind the Bates's home. When Sergeant Walker asked whether Mrs. Bates was under arrest, Deputy Harvey responded, "not at this time. We need to find [J.T.]" Harvey Dep. at 79. Other officers, who were already on their way to the Bates residence in response to Deputy Harvey's earlier call for back up, joined in the search for J.T. Deputy Harvey ordered another officer to remain with Mrs. Bates before dashing out the side door in pursuit of J.T. Sergeant Walker also remained in the home for some time before leaving to participate in the search.

Mrs. Bates slipped the one handcuff, which was not fully clasped, off her wrist. Although the officers remained in the house, Mrs. Bates moved freely about, showered and called her sister for legal advice. Gary Bates asked Sheriff Jimmy Thomas, whom he knew personally, to come to their home and discuss the morning's events. Deputy Harvey and the other officers eventually called off their search and allowed plain clothes officers to continue looking for J.T. Another officer found J.T. a few hours later on a nearby roadway.

After chasing for J.T., Deputy Harvey returned to the Bates residence to effect the arrest of Mrs. Bates for obstruction of justice. Mrs. Bates was speaking with Gary Bates by his truck in the driveway. Upon seeing Deputy Harvey, Mr. and Mrs. Bates ended their conversation and went inside their home. Deputy

Harvey spoke with Sheriff Thomas, telling him that he had probable cause to arrest Mrs. Bates for felony obstruction of justice. Deputy Harvey entered the Bates residence a second time, handcuffed and arrested Mrs. Bates in her living room, and led her out to his patrol car. Deputy Harvey had neither an arrest warrant nor a search warrant. Deputy Harvey transported Mrs. Bates to the Pike County Sheriff's Office, where she was booked and released on bond later that day.[5]

Mrs. Bates subsequently filed an internal affairs complaint against Deputy Harvey. She alleged that she suffered bruises to her face, arms, legs, and feet, and injuries to her iliosacral joint as a result of the incident. After Mrs. Bates refused to allow an internal affairs investigator to interview her three children privately, the investigator dismissed Mrs. Bates's complaint as unsubstantiated.

On March 27, 2003, a Pike County magistrate judge issued a warrant for Mrs. Bates's arrest after Deputy Harvey testified that Mrs. Bates violently kicked him in the groin during the March 21, 2003 incident. Pike County officers arrested Mrs. Bates at her home for aggravated assault on April 2, 2003. The assault charge ultimately was dismissed. The Pike County Grand Jury, however,

---

[5] Pike County Sheriff's Office Records indicate that Mrs. Bates was arrested at 11:53 a.m. and released at 2:00 p.m. on March 21, 2003.

indicted Mrs. Bates on one count of felony obstruction of a law enforcement officer. *See* Ga. Code Ann. § 16-10-24(b) (2003).[6]

Before her felony obstruction trial, Mrs. Bates moved in limine to exclude testimony from Sergeant Walker and Deputy Harvey on the ground that they violated her Fourth and Fourteenth Amendment rights by entering her home without a search warrant, consent, or exigent circumstances. The trial court denied Mrs. Bates's motion in limine, as well as her subsequent motion for a directed verdict. A jury ultimately acquitted Mrs. Bates of the felony obstruction charge.

Following her trial, Mrs. Bates filed a civil rights action, pursuant to 42 U.S.C. § 1983, against Deputy Harvey and Sheriff Thomas alleging, *inter alia*, that Deputy Harvey unlawfully arrested her on March 21, 2003, violating her Fourth Amendment rights.[7] Deputy Harvey claimed entitlement to qualified immunity and moved for summary judgment. The district court granted Deputy Harvey's motion for summary judgment on all claims except the March 21, 2003 false arrest claim. The district court found that Deputy Harvey was not entitled to

---

[6] O.C.G.A. § 16-10-24(b) provides: "Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer . . . in the lawful discharge of his official duties by offering or doing violence to the person of such officer . . . is guilty of a felony . . . ."

[7] On March 17, 2006, the district court ordered, per the parties' stipulation, that Sheriff Thomas be terminated as a defendant; all claims against him were dismissed with prejudice.

qualified immunity from this claim because the law was clearly established that he could not enter Mrs. Bates's home and arrest her without a warrant, consent or exigent circumstances, even if he had probable cause. The court found that under clearly established law the facts demonstrated neither consent nor exigent circumstances to justify Deputy Harvey's warrantless entry.

Deputy Harvey appeals the district court's denial of his motion for summary judgment on several grounds. First, he argues that the state trial court conclusively established his lawful entry into Mrs. Bates's home, and therefore, the *Rooker-Feldman* doctrine and issue preclusion prohibited the district court from addressing the issues of consent and probable cause underlying Mrs. Bates's Fourth Amendment challenge. Second, Deputy Harvey argues that consent or exigent circumstances justified his warrantless search and seizure. Finally, Deputy Harvey argues that even if he did violate Mrs. Bates's Fourth Amendment rights, he is nonetheless entitled to qualified immunity because the law was not clearly established that the averments made in the civil commitment order did not present sufficiently exigent circumstances to allow an exception to the warrant requirement for homes.

## II. STANDARD OF REVIEW

11

The district court's denial of a motion for summary judgment on the basis of a qualified immunity defense is an immediately appealable final decision for which we have interlocutory jurisdiction under 28 U.S.C. § 1291, so long as the appeal involves a question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985); *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006), *cert. denied*, — U.S. —, 127 S. Ct. 2428 (2007). Whether qualified immunity shields an official from suit is a question of law. *Bennett v. Parker*, 898 F.2d 1530, 1532 (11th Cir. 1990). We therefore review the district court's denial of a motion for summary judgment on the basis of qualified immunity *de novo*, viewing the facts in the light most favorable to the non-moving party. *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004). With the facts so construed, we have "the plaintiff's best case in hand," and therefore, "material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity . . . ." *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005), *cert. denied*, 546 U.S. 1109, 126 S. Ct. 1063, 163 L. Ed. 2d 887 (2006). Thus, we determine the legal issue of whether the defendant was entitled to qualified immunity using the version of facts most

favorable to the plaintiff.  *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003).

## III.  DISCUSSION

A.  *Nature of the Claim*

In the district court Mrs. Bates asserted several claims, but on appeal her only claim is that she was unlawfully arrested, in violation of the Fourth Amendment, for felony obstruction of a law enforcement officer.  "In Fourth Amendment terminology, an arrest is a seizure of the person, and the 'reasonableness' of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest."  *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (citation omitted).  Thus, to establish a constitutional violation in a § 1983 false arrest claim, the plaintiff ordinarily must prove that the officer arrested her without at least arguable probable cause to believe she had committed or was committing a crime.  *Id.*  However, where we have an arrest, like Mrs. Bates's, that (1) occurs within the arrested person's home and (2) is not accompanied by either an arrest or search warrant, the plaintiff must prove that the officer's presence in the her home was unlawful to establish a constitutional violation.

Because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," it is "a basic principle of Fourth

13

Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585–86, 100 S. Ct. 1371, 1379–80, 63 L. Ed. 2d 369 (1980) (quotation marks and citations omitted). The presumption is rebutted, and the arrest lawful, only when some exception to the warrant requirement—such as consent or exigent circumstances—exists. *See Kirk v. Louisiana*, 536 U.S. 635, 635, 122 S. Ct. 2458, 2458, 153 L. Ed. 2d 599 (2002); *Bashir v. Rockdale County*, 445 F.3d 1323, 1327–28 (11th Cir. 2006); *United States v. McGough*, 412 F.3d 1232, 1236–37 (11th Cir. 2005).

The rule that in-home arrests violate the Fourth Amendment unless they are accompanied by a warrant or an exception to the warrant requirement applies "even when [the arrest] is accomplished under statutory authority and when probable cause is clearly present." *Payton*, 445 U.S. at 589, 100 S. Ct. at 1381; *accord Bashir*, 445 F.3d at 1328 ("Although the district court ruled the officers had probable cause to arrest Bashir for disorderly conduct, a ruling Bashir has not challenged on appeal, the existence of probable cause does not by itself validate a warrantless home arrest."). Thus, to obtain qualified immunity from Mrs. Bates's false arrest claim, Deputy Harvey must demonstrate that his presence in the Bates home without a warrant was lawful or did not violate then-clearly established law.

14

Accordingly, despite the fact that Mrs. Bates's claim is for wrongful *arrest*, much of our analysis concerns the legality of the officers' initial *entry* into her home, because the effectuation of her arrest was a continuation of the initial search and seizure.[8]

B.     *The* Rooker-Feldman *Doctrine and Issue Preclusion*

Congress has vested the review of final judgments by a state's highest court within the sole jurisdiction of the U.S. Supreme Court.  28 U.S.C. § 1257.  The *Rooker-Feldman* doctrine acknowledges the Supreme Court's exclusive jurisdiction in this respect by "prevent[ing] lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.'"  *Lance v. Dennis*, 546 U.S. 459, 460, 126 S. Ct. 1198, 1199, 163 L. Ed. 2d 1059 (2006) (per curiam) (quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517, 1521–22, 161 L. Ed. 2d 454 (2005)); *see also Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923) (holding that

---

[8] Upon his initial entry into and search of the Bates home, Deputy Harvey verbally expressed his intent to arrest Mrs. Bates after finding J.T. and ordered other officers to remain with her until his return.  Under all the particular factual circumstances of this case, we decline Deputy Harvey's request to analyze his conduct as two separate incidents, marked by two separate entries, especially given that, among other factors, a reasonable person in Mrs. Bates's position would not have believed she was free to leave or terminate the encounter with the officers.

lower federal courts could not entertain a proceeding to review substantive constitutional questions decided in a state court judgment); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983) (holding that Article III of the Constitution mandates that a claim of right denied by a judicial order of a state court may only be reviewed by the Supreme Court when federal questions are raised). The *Rooker-Feldman* doctrine is distinct from issue preclusion, formerly "collateral estoppel," although the two principles are closely related. *Agripost, Inc. v. Miami-Dade County, ex rel. Manager*, 195 F.3d 1225, 1229 n.7 (11th Cir. 1999); *see also Lance*, 546 U.S. at 466, 126 S. Ct. at 1202.

While the *Rooker-Feldman* doctrine pertains to the subject-matter jurisdiction of the federal courts, issue preclusion relates to the question of when a federal court may decline to hear a matter of dispute within its jurisdiction. As to the latter inquiry, issue preclusion bars identical parties to a proceeding from relitigating issues that were adjudicated in the former proceeding. A court may give preclusive effect to a matter in dispute only when (1) that issue is identical to an issue decided in an earlier proceeding; (2) the issue was actually litigated on the merits; (3) the issue was decided in the earlier proceeding, meaning "the prior determination of the issue must have been a critical and necessary part of the

16

judgment in that earlier decision"; and (4) the burden of proof in the earlier proceeding is at least as stringent as the burden of proof in the current proceeding. *In re Southeast Banking Corp.*, 69 F.3d 1539, 1552 (11th Cir. 1995). Moreover, the party against whom issue preclusion is being sought must have had a "full and fair opportunity" to litigate the issue in the prior proceeding. *Winegard v. Emerald Venture Florida LLC*, 438 F.3d 1288, 1293 (11th Cir. 2006).

Deputy Harvey claims that by denying Mrs. Bates's motions in limine to exclude the officers' testimony and for a directed verdict in her felony obstruction trial, the Georgia trial court necessarily decided that the officers lawfully entered Mrs. Bates's house and had probable cause to arrest her, and the district court thus should have held that the *Rooker-Feldman* doctrine and issue preclusion bar Mrs. Bates from re-litigating those issues. We reject this argument.

The *Rooker-Feldman* doctrine "is confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments . . . ." *Exxon Mobil*, 544 U.S. at 284, 125 S. Ct. at 1521–22. The doctrine's jurisdictional bar does not extend to "federal actions that simply raise claims previously litigated in state court." *Id.* at 287 n.2, 125 S. Ct. at 1524 n.2. Mrs. Bates is not a "state-court loser"; nor does she complain of an injury caused by a state-court judgment. Not only was she acquitted in her felony obstruction trial, but the state court trial

17

transcript reveals that the state court never held, either expressly or by fair inference, that the officers had consent to enter the Bates home, that their entry was otherwise lawful, or that they had probable cause to arrest Mrs. Bates. The *Rooker-Feldman* doctrine does not apply.

Similarly, Mrs. Bates is not precluded from re-litigating the issues of consent or probable cause. In denying Mrs. Bates's motion in limine, the state court merely opted to rule on contemporaneous objections to proffered evidence. With respect to Mrs. Bates's directed verdict motion, the state court simply allowed the jury to decide whether Mrs. Bates violated Georgia's felony obstruction statute.[9] There was no finding by either the state court or the jury as to whether the officers lawfully entered the Bates home or had probable cause at the time they arrested Mrs. Bates. Because the questions of lawful entry and probable cause were not actually litigated and decided, issue preclusion is inapplicable.

C.    *Qualified Immunity*

Under 42 U.S.C. § 1983, an aggrieved party may seek a remedy against government officials for the violation of her constitutional rights in a suit for damages.[10] *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 1696, 143 L. Ed.

_____

[9] *See supra* note 6.

[10] 42 U.S.C. § 1983 provides, in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of

18

2d 818 (1999); *see also Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91, 98 S. Ct. 2018, 2035–36, 56 L. Ed. 2d 611 (1978) (extending liability under § 1983 to municipalities and other local governmental units for their deprivation of constitutional rights).  Section 1983 is a particularly important tool for redressing constitutional violations because, in many situations, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees."  *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736, 73 L. Ed. 2d 396 (1982).

Qualified immunity protects law enforcement officials from § 1983 suits for civil damages arising from the discharge of their discretionary functions, "as long as their actions could *reasonably* have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987) (emphasis added).  Qualified immunity proceeds from the concern that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the

---

any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

discharge of their duties." *Id.* For this reason, qualified immunity is a privilege that provides "'an *immunity from suit* rather than a mere defense to liability.'" *Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)). Qualified immunity affords "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986). To preserve this immunity from suit at the earliest stages of litigation, *Saucier* "instructs that '[i]f the law did not put the officer *on notice* that his conduct would be *clearly* unlawful, summary judgment based on qualified immunity is appropriate.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (quoting *Saucier*, 533 U.S. at 202, 121 S. Ct. at 2156–57).

A plaintiff who seeks to avoid summary judgment on the basis of qualified immunity must show not only that the officer violated her federal constitutional or statutory rights, but also that those rights were clearly established at the time the officer acted. *See Wilson*, 526 U.S. at 609, 119 S. Ct. at 1697. Under qualified immunity's shifting burden of proof, an officer must first "prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Estate of Kesinger*, 381 F.3d at 1248. Once the officer has satisfied his

20

burden, "the burden then shifts to the plaintiff to establish that qualified immunity is not appropriate." *Id.* Qualified immunity is not appropriate where the officer's actions were objectively unreasonable: that is, under the facts and circumstances known to the officer at the time, his actions violated clearly established law.

As noted earlier, Mrs. Bates's suit arises out of Deputy Harvey's attempt to help Sergeant Walker execute a civil commitment order. Thus, the district court correctly determined that Deputy Harvey was exercising discretionary authority as an officer with the Pike County Sheriff's Office. We now address whether Mrs. Bates can avoid summary judgment on the basis of qualified immunity.

1. *Unlawful Arrest: Constitutional Violation*

We begin our qualified immunity analysis by examining "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed. 2d 666. Mrs. Bates alleges that on March 21, 2003, Deputy Harvey violated her Fourth Amendment rights by entering her home illegally—without a warrant, valid consent, or exigent circumstances—to search for J.T. and subsequently arresting her in her home after she verbally protested his unlawful presence.

The Fourth Amendment, incorporated to the States by the Fourteenth Amendment, provides:

21

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The "centuries-old principle of respect for the privacy of the home" is the fountainhead of our Fourth Amendment protections. *Wilson*, 526 U.S. at 610, 119 S. Ct. at 1697. The warrant requirement guards this privacy and minimizes the danger of unnecessary "physical entry of the home." *Payton*, 445 U.S. at 585–86, 100 S. Ct. at 1379–80. It is a fundamental rule of Fourth Amendment law that warrantless searches and seizures inside a home are presumptively unreasonable. *Id.* at 586, 100 S. Ct. at 1380.

Although the Fourth Amendment shields one's home from unwanted and warrantless intrusions by law enforcement officers, "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' [and thus,] the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, —, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006). Two "specifically established and well-delineated exceptions" are warrantless searches made pursuant to consent or under exigent circumstances. *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967). Specifically, a warrantless search does not violate the Fourth Amendment where there is voluntary consent given by a person

22

with authority.  *Illinois v. Rodriguez*, 497 U.S. 177, 181, 100 S. Ct. 2793, 2797, 111 L. Ed. 2d 148 (1990).  Similarly, a warrant is not required where "'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'"  *Stuart*, 126 S. Ct. at 1947 (internal quotation marks omitted) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–94, 98 S. Ct. 2408, 2414, 57 L. Ed. 2d 290 (1978)).  Deputy Harvey does not dispute that he entered Mrs. Bates's home to search for J.T. without a search warrant.  However, Deputy Harvey argues that he did not violate Mrs. Bates's Fourth Amendment rights because both consent and exigent circumstances justified his warrantless entry.  We address each argument in turn.[11]

    a.  <u>Consent</u>

---

[11] Deputy Harvey also argues that because Mrs. Bates was on probation at the time of the incident, she had no right against warrantless arrest in her home.  He cites *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001), in support of this proposition.

Contrary to Deputy Harvey's contention, "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'"  *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 3168, 97 L. Ed. 2d 709 (1987).  In *Knights*, the Supreme Court held that a warrantless search of a probationer's home is reasonable under the Fourth Amendment where the search is made pursuant to an *express waiver* of one's Fourth Amendment rights as a condition of probation and supported by reasonable suspicion.  534 U.S. at 122, 122 S. Ct. at 593.  Here, Mrs. Bates does not contest that she was on probation, but there is no evidence in the record indicating that consent to warrantless searches and seizures in her home was a condition of her probation.  Nor is there any evidence that Deputy Harvey or Sergeant Walker had any reasonable grounds to believe, before entering Mrs. Bates's home, that she had contraband or was engaged in criminal activity there.  We therefore reject Deputy Harvey's argument that Mrs. Bates lacked a reasonable expectation of privacy in her home.

23

Deputy Harvey argues that H.B., who was then 18 years old, invoked her authority as a resident and voluntarily consented to the officers' search for J.T. shortly after they entered the Bates residence. Mrs. Bates counters that H.B. did not give the officers consent.

For a warrantless search to be constitutionally valid on the basis of consent, that consent must be given voluntarily by an individual possessing "common authority" over the premises. *Rodriguez*, 497 U.S. at 181, 100 S. Ct. at 2727. Common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes," and is not implicated by a mere property interest alone. *United States v. Matlock*, 415 U.S. 164, 172, n.7, 94 S. Ct. 988, 993 n.7, 39 L. Ed. 2d 242 (1974). Consent is voluntary when it is "'the product of an essentially free and unconstrained choice.'" *United States v. Gonzales*, 71 F.3d 819, 829 (11th Cir. 1996) (quoting *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989)). We have found that meaningful consent cannot be derived from the mere failure to object to a search, and that "whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to 'sanction[ ] entry into the home based upon inferred consent.'" *Id.* (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir.1990)).

The parties dispute whether H.B. actually consented to the search. At Mrs. Bates's felony obstruction trial, neither Deputy Harvey nor Sergeant Walker testified that H.B. was asked for or had given them consent to search; they both testified only that they asked H.B. whether J.T. was in the house and that she indicated he was not. Deputy Harvey, in fact, testified that H.B. said no words to him at all, but just shook her head when he asked about J.T. H.B., though, testified at her deposition that the officers entered her bedroom and asked her if it was alright to look around, and that she replied "something to the effect of I guess so." H.B. Dep. at 7-8. Even if accepted, H.B.'s response is, at best, an equivocal answer, and we cannot imply consent from her failure to object to the officers' search. Construing the facts in favor of Mrs. Bates at the summary judgment stage, we agree with the district court that Deputy Harvey did not have consent to enter and search Mrs. Bates's home.

b. Exigent Circumstances

Deputy Harvey also argues that exigent circumstances justified his warrantless entry into the Bates residence. He claims that he relied on the civil commitment order, which included Mark and Wanda Wilson's averments that J.T. "present[ed] a substantial risk of serious harm to himself or others as manifested by either recent overt acts or recent expressed threats of violence which present a

25

probability of physical injury to himself or to other persons."  According to Deputy Harvey, these statements demonstrated a danger to persons inside the Bates residence and created sufficiently exigent circumstances.  He also argues that J.T.'s confirmed presence in the home created a risk of flight, another form of exigent circumstance.  Mrs. Bates claims that because Deputy Harvey did not know if J.T. was in the house when he first entered, he had no fear of imminent danger, flight, or any other exigency to justify his warrantless entry and search, notwithstanding the civil commitment order.  She argues that the evidence clearly shows that the officers were in no particular haste in executing the order and did not treat it as an emergency.

In *Payton*, the Supreme Court laid down the firm rule that unless exigent circumstances are present, the threshold to the entrance of the home "may not reasonably be crossed without a warrant."  445 U.S. at 590, 100 S. Ct. at 1382.  As the Court has explained, the purpose of this rule "was not to protect the person of the suspect but to protect his home from entry in the absence of a magistrate's finding of probable cause." *Minnesota v. Olsen*, 495 U.S. 91, 95, 110 S. Ct. 1684, 1687, 109 L. Ed. 2d. 85 (1990).  The Court later extended the *Payton* rule, so that absent exigent circumstances, law enforcement officers may not enter the home of a third party to search for the subject of an arrest warrant without first securing a

search warrant for that home. *Steagald v. United States*, 451 U.S. 204, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981).[12] The court reasoned that an arrest warrant alone was insufficient because "[a]rmed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." *Id.* at 215, 101 S. Ct. at 1649. The Court was concerned that "[a] contrary conclusion . . . would create a significant potential for abuse." *Id.*

The police thus bear a heavy burden of proving that the exigent circumstances exception validates a warrantless entry or search of a third party's home to look for a non-resident. *Welsh*, 466 U.S. at 749–50, 104 S. Ct. at 2097; *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S. Ct. 1969, 1972, 26 L. Ed. 2d 409 (1970)). The government meets that burden by demonstrating the existence of both probable cause and exigency. *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002). Where the exigency is an emergency, "probable cause exists where law enforcement officials 'reasonably believe' that someone is in danger." *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002) (per curiam). Based on the averments in the civil commitment order, Deputy Harvey

---

[12] Thus, *Payton* holds that officer lacking consent, exigent circumstances, or a search warrant can, with an arrest warrant, lawfully enter the home of the subject of the arrest warrant. *Payton*, 445 U.S. at 602–03, 100 S. Ct. at 1388. But under *Steagald*, an arrest warrant is not enough to permit lawful entry into a third party's home. *Steagald*, 451 U.S. at 205–06, 101 S. Ct. at 1644. Neither *Payton* nor *Steagald* addresses whether a civil commitment order may authorize entry into a home—either that of the subject of the order or someone else's.

had probable cause to believe that J.T. was in danger. The question remains, however, whether Deputy Harvey faced sufficiently exigent circumstances to justify his warrantless entry and search of Mrs. Bates's home.

The *Payton* Court "ha[d] no occasion to consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." 445 U.S. at 583, 100 S. Ct. at 1378. Since *Payton*, however, both the Supreme Court and this court have addressed the question of what constitutes exigent circumstances.

The exigent circumstances exception to the warrant requirement is based on the understanding that in some situations, "a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949, 56 L. Ed. 2d 486 (1978). Thus, we will excuse a warrantless entry into the home "when probable cause exists, if 'exigent circumstances' make it impossible or impracticable to obtain a warrant." *United States v. McGregor*, 31 F.3d 1067, 1068–69 (11th Cir. 1994). This "encompasses situations such as hot pursuit of a suspect, risk of removal or destruction of evidence, and danger to the arresting officers or the public." *United States v. Edmondson*, 791 F.2d 1512,

28

1515 (11th Cir. 1986). We have found situations to be sufficiently exigent "where there is danger to human life." *Holloway*, 290 F.3d at 1334. "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Id.* at 1336. Accordingly, "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Stuart*, 126 S. Ct. at 1946.

We agree with the district court that Deputy Harvey failed to demonstrate circumstances sufficiently exigent to justify his warrantless entry into Mrs. Bates's home. Deputy Harvey read the civil commitment order and was therefore aware of the averments in the form affidavit that J.T. presented a substantial risk of immediate harm to himself or others. Yet, the affidavit stated that J.T. resided at a different address. The affidavit and the order did not state that J.T. might be found at the Bates home. All Sergeant Walker knew, and all that Sergeant Walker told Deputy Harvey, was that J.T.'s mother said that her son might be spending the night at a friend's house, which was in a different county. As the district court properly noted, when the officers arrived at the home, Deputy Harvey first asked S.B., and later H.B., if J.T. was inside, further demonstrating his lack of

29

knowledge as to whether J.T. was in the home. More importantly, at the door, S.B. said that J.T. wasn't there.[13] Even after the officers went inside, H.B. told them she didn't know if J.T. was present. Finally, Deputy Harvey's own testimony indicates that he knew nothing about Mrs. Bates or anyone else inside the Bates residence.[14]

Based on these facts, we conclude that after being advised J.T. was not there, Deputy Harvey did not have an objectively reasonable basis for believing that there was an occupant in the Bates home who was a danger to himself or others such that it was impossible or impracticable to obtain a search warrant

---

[13] Deputy Harvey contends that S.B. told him that she didn't know if J.T. was at the house, but that she also told him that C.L. and J.T. had been out together the previous night, and that C.L. drove a red pickup truck, which Deputy Harvey saw parked in the Bates driveway. However, Sergeant Walker testified that he did not remember any mention of a red pickup truck, and S.B.'s testimony contradicts Deputy Harvey's version of events: she testified that she told the officers that J.T. was not there, that they then asked her who else was there, and that before she could finish answering they asked if they could enter the house and, despite her saying she didn't know, they then entered and began searching for J.T. The facts, viewed most favorably to Mrs. Bates, thus indicate that S.B. denied that J.T. was in the house and made no mention of C.L., his truck, or the activities of the night before.

[14] Deputy Harvey's near-total lack of information regarding the situation inside the Bates home (including, specifically, whether J.T. was present there) and S.B.'s statement at the door that J.T. was not there distinguishes this case from the exigent circumstances present in *Stuart* and *Holloway*. *See Stuart*, 126 S. Ct. at 1949 (officers called to home by noise complaints heard sounds of a fight coming from within and, upon further investigation, saw several individuals fighting inside); *Holloway*, 290 F.3d at 1338 (officers received dispatches of 911 calls reporting sounds of arguing and gunshots coming from inside home). We also stress that, because Deputy Harvey was attempting to serve the civil commitment order at the home of an unrelated third party, Deputy Harvey could not have had an objectively reasonable basis for inferring that J.T. might be present merely from the fact that it was J.T.'s own home.

30

before barging into a third party's home to execute a civil commitment order for a person not related to the residents there and known to reside at a different address. We recognize that Wanda Wilson verbally stated that J.T. may have been spending the night there, but she also stated in the civil commitment affidavit that J.T. resided elsewhere, and at the door of the Bates home, S.B. said that J.T. was not there. Contrary to Deputy Harvey's contentions, a civil commitment order for a mentally ill or substance-dependent person does not, standing alone, provide law enforcement officers with a mandate to enter and search the home of every third-party friend or acquaintance of that person, especially when a resident at the door of the home says the person is not there. Such a result flies in the face of objective reasonableness and would result in the most abusive intrusions into the most highly guarded sphere under the Fourth Amendment: the home. Nor did Deputy Harvey face exigent circumstances once he located J.T. in the home. Deputy Harvey admits that J.T. was fully cooperating with the officers and that he perceived no threat of imminent danger to himself or anyone else, until he commenced the scuffle with Mrs. Bates.[15]

---

[15] Thus, as in *Bashir*, "this is not a situation where exigent circumstances arose after an unlawful entry." 445 F.3d at 1328 n.6.

31

Because Deputy Harvey did not have consent nor face sufficiently exigent circumstances to justify his warrantless entry, search and arrest in Mrs. Bates home, he violated Mrs. Bates's constitutional rights under the Fourth and Fourteenth Amendments.[16] We now turn to whether those rights were clearly established at the time Deputy Harvey acted.

2. *Unlawful Arrest: Clearly Established Law*

---

[16] In the district court and now on appeal, Deputy Harvey also claims that the "special needs" exception to the warrant requirement justified his entry into Mrs. Bates's home. The special needs exception applies to warrantless searches conducted pursuant to a governmental policy or procedure aimed to achieve some non-law-enforcement administrative or regulatory purpose that would be frustrated by application of the warrant requirement. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386 (1995) (school policy authorizing random urinalysis drug testing of student athletes); *Nat'l Treas. Employees Union v. Von Raab*, 489 U.S. 656, 109 S. Ct. 1384 (1989) (drug-testing program requiring urinalysis test of employees); *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 109 S. Ct. 1402 (1989) (regulations mandating drug and alcohol testing of employees involved in certain train accidents); *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164 (1987) (state regulations permitting probation officers to search a probationer's home if there are reasonable grounds to believe contraband is present).

In this case there is no evidence of any governmental policy or procedure about warrantless entry into homes of third parties who are not the subject of the civil commitment order. Indeed, at Mrs. Bates's felony obstruction trial, Deputy Harvey was asked whether there was any "particular procedure in place" for serving civil commitment orders, and he indicated that there was no procedure other than "just treating people with courtesy and respect and being polite with them." R.47-10 at 8. Deputy Harvey further testified that he did not believe that the civil commitment order authorized him to enter the Bates home without consent. R.47-12 at 43. Thus, we need not decide whether a special needs exception could apply to certain civil commitment orders. *Cf. McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 545 (1st Cir. 1996) (upholding city policy permitting warrantless entry of homes to execute involuntary civil commitment orders issued upon an expert medical finding of a likelihood of serious harm, and stating that "a residential search pursuant to an established warrantless search *procedure* may be reasonable if conducted in furtherance of an important administrative or regulatory purpose, or 'special need,' which would be undermined *systematically* by an impracticable warrant or probable-cause requirement").

For a constitutional right to be "clearly established" the "contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640, 107 S. Ct. at 3039. A plaintiff need not show that the officer's conduct specifically has been held unlawful. Rather, to avoid having her suit barred by qualified immunity, a plaintiff need only show that "in the light of pre-existing law the unlawfulness [was] apparent." *Id.* Thus, the "salient question" for our clearly established analysis is whether the state of the law at the time the officers acted gave them "fair warning" that their conduct was unconstitutional. *Hope*, 536 U.S. at 741, 122 S. Ct. at 2516.

We have identified three ways in which the law can give an officer "fair and clear notice" that his conduct is unconstitutional. First, the constitutional provision in question "will be specific enough to establish clearly the law applicable to particular conduct and circumstances." *Vinyard*, 311 F.3d at 1350. Where, however, "the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law*."[17] *Id.* at 1351. Under

---

[17] In our qualified immunity analysis, "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state . . . can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007); *see also Marsh v. Butler County*, 268 F.3d 1014, 1032, n.10 (11th Cir. 2001) (en banc). The applicable state case law in this case is from the Supreme Court of Georgia.

this second method of providing fair and clear notice, a broad principle found in the case law can "establish clearly the law applicable to a specific set of facts facing a government official" when the principle is set forth "'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* As a third method, "if we have no case law with a broad holding . . . that is not tied to particularized facts, we then look at precedent *that is tied to the facts*." *Id.*

We have found that "[o]ne of the most compelling events giving rise to exigent circumstances is the occurrence of an emergency situation." *Holloway*, 290 F.3d at 1335. "The most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life." *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413, 57 L. Ed. 2d 290 (1978)). In *Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782, the Court found the warrantless entry of a third party's home to be reasonable where the police were in pursuit of an armed robbery suspect who was seen fleeing into the third party's home within minutes of the robbery. *Id.* at 298, 87 S. Ct. at 1645–46. In concluding that the "Fourth Amendment does not require police officers to delay in the course of an

investigation if to do so would gravely endanger their lives or the lives of others," the Court found that speed was essential under the circumstances the officers faced, and that only a complete search of the home would have secured the suspect and any possible weapons. *Id.* at 298–99, 87 S. Ct. at 1646.

We have previously addressed the question of whether a situation presents a danger to human life so as to fall within the exigent circumstances exception. In *Holloway*, we upheld the warrantless entry and search of appellant's home by police officers responding to 911 calls reporting gunshots and loud arguing at appellant's address. 290 F.3d 1338. The officers immediately proceeded to the residence upon the first dispatch and received a second dispatch indicating repeated gunshots and arguing on the way to the home. *Id.* Once at the scene, nothing dissuaded the officers from believing the veracity of the 911 calls. *Id.* Rather, the officers' observations upon arrival at the residence supported the information conveyed by the 911 caller. *Id.* We noted that, under the circumstances known to them, the officers reasonably believed an emergency situation existed. *Id.* We found that based on the calls and the officers' observations at the scene, the officers had probable cause to believe that someone inside the residence was in danger and were justified in entering the home to search for victims. *Id.* We held that these circumstances were sufficiently exigent

and did not require the officers to obtain a warrant before entering the appellant's home. *Id.*

Because our clearly established inquiry centers on objective reasonableness, we have to examine how a reasonable officer in Deputy Harvey's position on March 21, 2003, would have interpreted and responded to the civil commitment order in light of then-clearly established law. Fourth Amendment law clearly established that the nonconsensual warrantless entry and search of a third party's home is per se unreasonable absent exigent circumstances. *See Steagald*, 451 U.S. 204. Under then-clearly established law, however, the contours of the Fourth Amendment were not sufficiently clear so as to give a reasonable officer fair and clear notice that the civil commitment order in this case did not invoke the exigent circumstances exception to the warrant requirement as to Mrs. Bates's home. Deputy Harvey was presented with an order by a state court judge that said that a young man needed to be picked up and placed in custody because he presented a danger to himself and to others. A reasonable officer could have interpreted these averments as indicating a life or death emergency and felt compelled to execute the order with the speed and immediate attention applicable in an emergency situation. In this case, the civil commitment order was effectuated on the same day it was issued, providing support to Deputy Harvey's argument that a

reasonable officer would think this was an emergency situation. Therefore, we find that Deputy Harvey is entitled to qualified immunity.

## IV. CONCLUSION

Deputy Harvey's initial warrantless entry and search of Mrs. Bates's home was presumptively unreasonable and not justified by either the consent or exigent circumstances exceptions to the Fourth Amendment warrant requirement. Therefore, his subsequent seizure and arrest of Mrs. Bates was unlawful, in violation of her constitutional rights under the Fourth and Fourteenth Amendments. Nevertheless, we are constrained to conclude that a reasonable officer could have believed, at the time Deputy Harvey acted, that the averments in the civil commitment order about a person presenting a substantial imminent threat of danger to himself or others presented a sufficiently emergent situation, justifying the warrantless entry and search of a third party's home for that person. Because the contours of the exigent circumstances exception were not sufficiently clear, prior to this case, to give a reasonable officer fair and clear warning that a warrantless entry and search such as this one was not justified, Deputy Harvey is entitled to qualified immunity. We therefore reverse the district court's denial of Deputy Harvey's motion for summary judgment based on qualified immunity and

remand for further proceedings consistent with this opinion.


REVERSED AND REMANDED.