**Bernice BROWN, et al., Plaintiffs,**

v.

**R.J. REYNOLDS TOBACCO CO., etc., et al., Defendants.**

**Case No. 3:07–cv–00761–J–25HTS.**

United States District Court, M.D. Florida, Jacksonville Division.

Aug. 28, 2008.

---

**1330**

Charlie Easa Farah, Jr., Farah & Farah, PA, Norwood Sherman Wilner, Stephanie J. Hartley, Wilner Block, PA, Jacksonville, FL, for Plaintiffs.

John Fachet Yarber, Stephanie E. Parker, Jones Day, Atlanta, GA, Joseph W. Prichard, Jr., Robert B. Parrish, Moseley, Prichard, Parrish, Knight & Jones, Dana G. Bradford, II, Smith, Gambrell & Russell, LLP, John Andrew Devault, III, Patrick P. Coll, Bedell, Dittmar, Devault, Pillans & Coxe, PA, Jacksonville, FL, James B. Murphy, Jr., Joshua R. Brown, Shook, Hardy & Bacon, LLP, Tampa, FL, Kenneth J. Reilly, Shook, Hardy & Bacon, LLP, Miami, FL, for Defendants.

### ORDER

HARVEY E. SCHLESINGER, District Judge.

This matter arises out of a class action involving approximately 700,000 citizens and residents of Florida who suffered or are presently suffering from various illnesses they claim were caused by addiction to cigarettes. After fourteen years of litigation and several appeals, the Florida Supreme Court in *Engle v. Liggett Group, Inc.*, 945 So.2d 1246 (Fla.2006) ("*Engle III*"), decertified the class, nevertheless pronouncing that certain generalized trial court findings must be given "res judicata" effect. *Id.* at 1269. After class decertification, thousands of individual claims were originally filed or removed to this Court. In their Complaints, Plaintiffs, relying on general factual findings made by the *Engle* jury and approved by the Florida Supreme Court, seek to estop Defendants from denying liability and general causation as to all former class members. (Am. Compl. ¶ 29.) Defendants now move pursuant to Federal Rule of Civil Procedure 16(c) to challenge Plaintiffs' proposed application of the *Engle* findings, arguing that such application would be in conflict with Florida law and with the dictates of due process as guaranteed by the Fourteenth Amendment. After reviewing the relevant background, the Court will consider these contentions in turn.

### I. Background

In May of 1994, six individuals filed a class action complaint seeking damages for injuries allegedly caused by smoking cigarettes. All six claimed that despite warnings of the harmfulness of smoking, they had become addicted to cigarettes and as a result of years of smoking had developed serious medical problems including heart disease and cancer. The allegations were made against the major domestic cigarette companies and two industry organizations

(collectively "Defendants").[1] On October 31, 1994, a Florida trial court certified the class defining the class as: "All United States citizens and residents, and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." Defendants filed an interlocutory appeal of the trial court's class certification order, and on January 31, 1996, the Florida District Court of Appeal for the Third District affirmed the trial court's order certifying the class, but reducing its scope to include only Florida citizens and residents (the "Engle class"). *R.J. Reynolds Tobacco Co. v. Engle*, 672 So.2d 39, 40–42 (Fla. 3d DCA 1996) (*"Engle I "*).[2]

On February 4, 1998, the trial court issued its first trial plan dividing the trial proceedings into three phases. Phase I consisted of a year-long trial on issues of liability and entitlement to punitive damages for the class as a whole. At trial the jury was to consider common issues relating exclusively to Defendants' conduct and the general health effects of smoking. On July 7, 1999, at the conclusion of the Phase I trial, the jury entered a verdict for the Engle class on all counts. Specifically, the Phase I findings were as follows:

> (1) that cigarettes caused many of the diseases suffered by members of the class[3]; (2) that nicotine is addictive; (3) that defendants placed cigarettes on the market that were defective and unreasonably dangerous; (4) that the defendants made false statements of material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers; (4)(a) that defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both; (5) that all of the defendants agreed to misrepresent information relating to the health effects of cigarettes or the addictive nature of cigarettes with the intention that smokers and the public would rely on this information to their detriment; (5)(a) that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment; (6) that all of the defendants sold or supplied cigarettes that were defective; (7) that all of the defendants sold or supplied cigarettes that at the time of the sale or supply did not conform to representations of fact made by the defendants; (8) that all of the defendants were negligent; (9) that all of the defendants engaged in extreme and outrageous conduct or with reckless disregard

---

1. The defendant cigarette companies and organizations are: Phillip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company, Lorillard Tobacco Company and Lorillard, Incorporated, The Council for Tobacco Research–U.S.A., Incorporated, and The Tobacco Institute, Incorporated.

2. Defendants filed a petition of review with the Florida Supreme Court, which was denied. *R.J. Reynolds Tobacco Co. v. Engle*, 682 So.2d 1100 (Fla.1996).

3. The verdict form listed twenty three diseases or medical conditions. The jury found that smoking cigarettes caused every disease listed except asthmatic bronchitis, infertility, and bronchioloalveolar carcinoma (a type of lung cancer). (Def.'s Ex. 1.)

relating to cigarettes sold or supplied to Florida smokers with the intent to inflict severe emotional distress; and (10) that all of the defendants' conduct rose to a level that would permit an award of punitive damages.

(Def.'s Ex. 1); *Engle III*, 945 So.2d at 1257.

Phase II was divided into two subparts. Phase II–A was intended to resolve the issues of causation and damages as to three individual class members. Phase II–B's purpose was to determine a lump sum punitive damages award for the entire class. In Phase II–A, the jury determined that the three class representatives [4] were entitled to compensatory damages in varying amounts offset by their comparative fault. The total compensatory damages award was $12.7 million. In Phase II–B, the jury awarded $145 billion in punitive damages to the class. The trial court then ordered that Defendants immediately pay the $145 billion punitive damages award into the court registry for the benefit of the Engle class.

The trial court then planned to move forward with Phase III, in which new juries were to decide the individual liability and compensatory damages for each class member. Before the Phase III proceedings could commence, Defendants filed an appeal with the Florida District Court of Appeal challenging the Phase I and Phase II verdicts.

On May 21, 2003, the Third District Court of Appeal issued its opinion decertifying the class and reversing the compensatory and punitive damages awards. *Liggett Group, Inc. v. Engle*, 853 So.2d 434 (Fla. 3d DCA 2003) (*"Engle II"*). In decertifying the class, the court of appeal noted that every court considering the issue had concluded that certification of smokers' cases is unworkable and improper because each claim is individualized, thus failing to satisfy the "predominance" and "superiority" requirements found in federal and state law for class certification. *Id.* at 444–45. It found that the Engle class claims were no different.[5] In addition, the court also found that individualized choice-of-law issues made the proceedings unmanageable as a class action. *Id.* at 447–48.

The court of appeal went on to reverse the trial court's award of punitive damages to the class because the award was made in the absence of findings of liability and compensatory damages, *id.* at 450, and on grounds that the award was excessive in violation of state and federal law. *Id.* at 456–57.[6] The court also reversed because of Plaintiffs' counsel's brazenly "race-

---

**4.** The three class representatives were Frank Amodeo, Mary Farnan, and Angie Delia Vecchia.

**5.** As an example of the individualized character of the claims, the court of appeal noted that during the course of the Phase II proceedings, fourteen different experts were required to testify on the issue of whether the class representatives' lung cancer was caused by smoking. With respect to class representative Farnan, Plaintiffs presented extensive testimony concerning her two primary cancers, including testimony of her family history of cancer, her unique symptomology, and the precise form of cancer. Delia Vecchia presented evidence concerning her unique treatment regime, unique medical history, and whether the form of cancer she developed was one caused by smoking. *Engle II*, 853 So.2d at 446 n. 9.

**6.** The court of appeal also found that the punitive damages award was barred by virtue of the settlement agreements entered into by the State of Florida and Defendants resolving an earlier lawsuit brought by the state. *Id.* at 467.

based appeals for nullification." *Id.* at 458. Indeed, the court of appeal pointed out that Plaintiffs' counsel engaged in a calculated scheme designed to incite the jury to disregard the law because the Defendants were tobacco companies. *Id.* at 459.[7]

The Engle class appealed and on December 21, 2006, the Florida Supreme Court partially affirmed, partially reversed, and remanded the court of appeal's ruling. *Engle III*, 945 So.2d at 1246. The court affirmed the court of appeal's decertification of the Engle class as to future proceedings and its reversal of the punitive damages award. However, the court reversed the court of appeal's ruling that the class was improperly certified at inception because doing so after a trial had taken place "does not accord with common sense and logic." *Id.* at 1267. The court also reinstated the Phase II–A verdicts in favor of two of the class representatives [8] and reversed the court of appeal's finding that Plaintiffs' counsel's arguments warranted reversal of the verdicts under Florida law.

Finally, although accepting the premise that class action treatment of the *Engle* matter was not feasible because "individualized issues such as legal causation, comparative fault, and damages predominate," the Florida Supreme Court held that the "pragmatic solution" [9] was to retain certain Phase I findings. *Id.* at 1269. Specifically, the court found it proper to retain the following findings: Questions 1 (general causation); 2 (addiction to cigarettes); 3 (strict liability); 4(a) (fraud by concealment); 5(a) (civil-conspiracy-concealment); 6 (breach of implied warranty); 7 (breach of express warranty); and 8 (negligence). *Id.* at 1255. The court struck the findings on fraud and misrepresentation (Question 4) and intentional infliction of emotional distress (Question 9), because they "involved highly individualized determinations." *Id.* at 1269. The court then declared that "[c]lass members can choose to initiate individual damages actions and the Phase I common core findings we approved … will have *res judicata* effect in those trials." *Id.* (emphasis added). Yet, the court admitted that "the Phase I verdict did not constitute a finding of liability." *Id.* at 1263. Indeed, according to the court "the Phase I jury did *not* determine

---

**7.** Plaintiffs' counsel began the trial by making racially-charged remarks to the predominately African–American jury, telling the jury that the Defendants divided American consumer groups by race. Counsel then linked these racial references at closing arguments stating: "And let's tell the truth about the law, before we get all teary-eyed about the law. Historically, the law has been used as an instrument of oppression and exploitation." Counsel then juxtaposed Defendants' alleged conduct to the Holocaust and slavery, creating the image that Defendants were as worthy of compassion as Nazis and slave traders. Defendants objected to these arguments, sometimes successfully, yet Plaintiffs' counsel continued, by making references to the poll tax, Strom Thurmond, and the Nazi extermination of European Jews, to sketch his *tableau vivant* of Defendants as the moral analogue of slave masters and fascists who hide behind rules designed to oppress the weak. *See Engle II*, 853 So.2d at 458–56.

**8.** The third named plaintiff's verdict was reversed because some of his claims were time-barred. *Engle III*, 945 So.2d at 1276.

**9.** In *Engle III*, the Florida Supreme Court, by judicial edict, declared that "res judicata" may be applied in certain cases so long as doing so would work a result deemed "pragmatic." Apparently the Florida Supreme Court presumed this application is legally vindicated, regardless of structural, procedural or substantive errors. According to the court, the test for determining if this unique doctrine is applicable is to consider whether "the procedural posture of [the] case is unique and unlikely to be repeated." *Engle III*, 945 So.2d at 1270 n. 12.

whether the defendants were liable to anyone." *Id.* (emphasis in original) (quotations and citations omitted).[10]

After the Florida Supreme Court's ruling, thousands of former Engle class members commenced proceedings in various Florida state and federal courts. On August 7, 2007, the parties jointly moved the Judicial Panel on Multidistrict Litigation to consolidate and transfer all the *Engle* progeny cases filed in federal court to the Middle District of Florida. The panel denied the motion. Thereafter, in January 2008, approximately 4,000 former Engle class members filed suit in Duval County Circuit Court. Approximately 660 of these claims had originally been filed in federal court. Defendants then removed virtually all of these state court actions to this Court[11] under the Class Action Fairness Act of 2005 ("CAFA"), Pub.L. No. 109–2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.).[12]

Before these cases progress any further, Defendants now move this Court to determine the preclusive effects of the *Engle* Phase I findings and determine whether those findings may be used to establish any of the elements of Plaintiffs' various claims and whether such use may be done in accordance with the dictates of established preclusion law and constitutional due process. Plaintiffs argue that this Court must give effect to the *Engle III* court's declaration that the trial court findings serve as "res judicata" to the claims brought by former Engle class members. Plaintiffs contend that under the Full Faith and Credit Clause of the Constitution and 28 U.S.C. § 1738, this Court must strictly apply the *Engle* Phase I findings. Plaintiffs also argue that the *Rooker–Feldman* doctrine bars this Court from independently reviewing the state court rulings.

## II. Analysis

Federal Rule of Civil Procedure 16(c) provides the Court and the parties with a vehicle to narrow the issues that must be decided at trial and with a means for scheduling proceedings to ensure that litigation proceeds in an orderly and efficient

---

**10.** Defendants' petition to the United States Supreme Court for a writ of certiorari was denied. *R.J. Reynolds Tobacco Co. v. Engle,* —— U.S. ——, 128 S.Ct. 96, 169 L.Ed.2d 244 (2007).

**11.** Each case filed in this Court is comprised of the claims of approximately 200 plaintiffs, totaling 3,400 individual cases.

**12.** The Class Action Fairness Act of 2005 created federal jurisdiction over certain class action lawsuits previously confined within the state court systems. CAFA was crafted as a remedy, if not a panacea, to perceived state court mishandling, if not outright corruption, of class actions and myriad abuses perpetrated by plaintiff's class counsel. *See id.* § 2, 119 Stat., at 5. See S.Rep. No. 109–14, at 20–21 (2005), as reprinted in 2005 U.S.C.C.A.N. 3, 21, where the Senate Judiciary committee noted that:

> A ... common abuse in state court class actions is the use of the class device as

"judicial blackmail" in cases that border on frivolous.... As Judge Posner of the U.S. Court of Appeals for the Seventh Circuit has explained, "certification of a class action, even one lacking merit, forces defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability.... [Defendants] may not wish to roll these dice. That is putting it mildly. They will be under intense pressure to settle."

> *Id.* (quoting *In re Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293, 1299 (7th Cir.1995)). Interestingly, the Senate Judiciary Committee commented extensively on the perceived abuses perpetrated in state courts against the tobacco industry, mentioning the Engle class action as an example. *See id.* at 62.

manner. Most relevant to this case, while not substantively dispositive of any claim in the litigation, a preliminary ruling on the preclusive effects of the Phase I verdict will shape the scope of discovery the parties may conduct in order to fairly litigate this matter. *See In re Microsoft Corp. Antitrust Litig.*, 274 F.Supp.2d 741 (D.Md.2003).

### A.

The instant case presents an issue arising at the intersection of three of the law's more abstruse doctrines: full faith and credit; the *Rooker–Feldman* doctrine; and preclusion law. Although distinct in name and function, these doctrines often operate in the same channel of analysis. Indeed, it is the difficulty inherent in defining the interstices, if any exist, between these doctrines that leads to their labyrinthine reputation. *See generally* Larry W. Yackle, *Federal Courts* 149–55 (2d ed. 2003). In proceeding, the Court must first consider Plaintiffs' argument that *Rooker–Feldman* prevents this Court from considering Defendants' motion, as *Rooker–Feldman* serves as a jurisdictional bar. *See DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir.2008) (finding that jurisdictional question must be addressed prior to considering merits of claims).

Simply put, *Rooker–Feldman* is a doctrine "under which a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States District Court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); *see also Lance v. Dennis*, 546 U.S. 459, 463, 126

S.Ct. 1198, 163 L.Ed.2d 1059 (2006); *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284–85, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The doctrine is the namesake of two Supreme Court cases decided some sixty years apart. In *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), parties defeated in state court filed an action in federal district court asking the district court to declare the state court judgment "null and void" on grounds that the judgment was rendered in contravention of the United States Constitution. *Id.* at 414–15, 44 S.Ct. 149. First noting that the state court had acted within its jurisdiction, the Court explained that even if the state-court decision was incorrect, "that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding." *Id.* at 415, 44 S.Ct. 149. The *Rooker* Court recognized that the federal district courts lacked appellate authority to reverse a state court decision because federal district court jurisdiction is "strictly original." *Id.* at 416, 44 S.Ct. 149. The Court ultimately affirmed a lower court decree dismissing the suit for lack of jurisdiction, clarifying that only the Supreme Court possesses the power to exercise appellate authority over a state court judgment. *Id.*

*Rooker*'s companion case, *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), presented a more complicated situation. The two plaintiffs in *Feldman* had failed to graduate from an accredited law school as required for admission by the District of Columbia bar, but had petitioned the District of Columbia Court of Appeals for a waiver of this requirement. The D.C. court, which had promulgated the accreditation requirement in the first

instance, denied the waivers. The plaintiffs then filed complaints before the federal district court seeking an injunction to force the D.C. court to allow them to sit for the bar exam. *Id.* at 465–73, 103 S.Ct. 1303. The Supreme Court found that the D.C. court had acted judicially in denying the waiver petitions, and by exercising its jurisdiction and reviewing the petitions the D.C. court stripped the federal district court of jurisdiction to consider the matter. *Id.* at 479–82, 103 S.Ct. 1303. However, the Supreme Court found that the D.C. court had acted legislatively in promulgating the bar admission rule itself. *Id.* at 485–86, 103 S.Ct. 1303. Such "legislative" action, the Court found, would allow a party to seek review in federal court. *Id.* at 486, 103 S.Ct. 1303. Nevertheless, since the plaintiffs had filed petitions with the D.C. court in an attempt to obtain waiver of the rule, they were foreclosed from facially challenging the ruling in federal district court. *Id.* at 486, 103 S.Ct. 1303.

Putting the facts of the *Rooker–Feldman* cases aside, conceptually the doctrine derives from a construction of several jurisdictional statutes. Under 28 U.S.C. § 1331, the district courts are granted original jurisdiction over civil actions arising under federal law. Hence, because of this explicit grant of original jurisdiction, the negative implication is that the district courts have no appellate jurisdiction to review state court decisions. As a related proposition, 28 U.S.C. § 1257 provides the United States Supreme Court with exclusive jurisdiction to review final judgments rendered by a state's highest court. The reverse implication of this explicit grant (or acknowledgment) [13] of appellate jurisdiction in the Supreme Court divests the district courts of appellate jurisdiction over final state court judgments. *See Lance,* 546 U.S. at 460, 126 S.Ct. 1198; *Bates v. Harvey,* 518 F.3d 1233 (11th Cir.2008).[14]

▆▆▆▆ With this sketch of the *Rooker–Feldman* doctrine's contours in mind, it is apparent that it is inapplicable to this matter. *Rooker–Feldman* deprives a district court of its subject matter jurisdiction to entertain claims that a final state court judgment violates the federal rights of the state court loser. *Johnson,* 512 U.S. at 1005–06, 114 S.Ct. 2647 In the run-

**13.** In *Durousseau v. United States,* 10 U.S. (6 Cranch) 307, 3 L.Ed. 232 (1810), the United States Supreme Court explained that its appellate jurisdiction arises directly from Article III of the Constitution and Congress alone has authority to create exceptions to that constitutionally educed judicial power.

**14.** The Eleventh Circuit has held that *Rooker–Feldman* applies when the following four criteria are met: "(1) the party in federal court is the same as the party in state court; (2) the prior state court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment." *Amos v. Glynn County Bd. of Tax Assessors,*

347 F.3d 1249, 1265 n. 11 (11th Cir.2003) (internal citations omitted). Admittedly, these elements attempt to sharpen the distinction between *Rooker–Feldman* and preclusion law, but an even easier to apply shorthand usually provides the same results: "[I]f the federal plaintiff was the plaintiff in state court, apply [preclusion law]; if the federal plaintiff was the defendant in state court, apply *Rooker–Feldman.*" *Garry v. Geils,* 82 F.3d 1362, 1367 (7th Cir.1996). Although the *Garry* court recognized that its rule of thumb would not always resolve the question of which doctrine to apply, it noted that "the typical federal claim of a party who was previously a defendant in state court is one alleging injury due more to the 'wrongful' state judgment than to any particular act of the opposing party." *Id.* at 1367.

of-the-mill fact pattern justifying application of the doctrine, as exemplified by the facts of *Rooker*, a state court loser files a mirror image case in federal court invoking the federal court's federal question jurisdiction, 28 U.S.C. § 1331, asking the federal court to void or modify a state court judgment on grounds that it is unconstitutional. *See Exxon–Mobil*, 544 U.S. at 284, 125 S.Ct. 1517 (describing *Rooker–Feldman* as a "narrow" doctrine applying to "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."). Defendants did not file an original case in this Court asking the Court to void the *Engle III* decision, but merely removed this case invoking this Court's diversity jurisdiction following the Florida Supreme Court's order decertifying the Engle class and announcing that the cases must be tried separately.[15] Moreover, nowhere is it suggested that *Rooker–Feldman* prevents a federal court

from adjudicating motions in a case it otherwise has jurisdiction to hear. Although the claims presently before this Court have taken a circuitous route to the federal courts, it was Plaintiffs who filed these actions following the *Engle III* decision. It would be incongruent with the doctrine's structure and purpose to find that the Defendants' decision to exercise its rights under CAFA divested this Court of jurisdiction over this case or Defendants' present motion.[16]

## B.

Finding that *Rooker–Feldman* does not bar this Court's exercise of jurisdiction, the Court may now consider the merits of Defendants' motion. The Plaintiffs in these cases seek to use the jury findings made in Phase I of the Engle class action to establish part of their individual claims against the Defendants. Defendants argue that the findings are so generalized that they cannot be used to satisfy any element of Plaintiffs' claims. In order to

---

**15.** Plaintiffs cite two cases supporting their argument that *Rooker–Feldman* divests this Court of subject matter jurisdiction. First, Plaintiffs cite to *Page v. City of Southfield*, 45 F.3d 128 (6th Cir.1995), for the proposition that Defendants' Rule 16(c) motion is akin to "seeking relief" for purposes of *Rooker–Feldman*. *Page* provides no support for this argument. The issue before the *Page* court was whether the federal removal statute, 28 U.S.C. § 1441, *et. seq.*, authorizes a district court to remand a case *sua sponte* for a perceived defect in the removal procedure, and nowhere addressed *Rooker–Feldman*.

Plaintiffs also cite *Beeler Prop's, LLC v. Lowe Enter's Residential Investors, LLC*, No. 07–149, 2007 WL 1346591 (D.Colo. May 7, 2007), arguing that the Defendants' motion for removal is synonymous to its filing an original complaint for purposes of *Rooker–Feldman*. While Plaintiffs are technically correct in the abstract, *Beeler*'s procedural history is distinguishable from the instant case. In *Beeler*, the state court issued an order authorizing a foreclosure sale. The property then went to auction and defendant was the successful bidder. *Id.* at \*1. Plaintiff then filed a state court action seeking a declaration that the foreclosure sale was invalid. *Id.* Defendant then removed the case to federal court. *Id.* The federal court then remanded the case on grounds that it lacked jurisdiction under *Rooker–Feldman* (and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). While true that the case found its way to federal court via removal, nonetheless, the party filing the original action challenging the state court foreclosure order was the losing state party. Here, the Engle class members (who were plaintiffs in the *Engle* action) filed the original actions, not the Defendants.

**16.** Indeed, the remedy under *Rooker–Feldman* is to dismiss the case *in toto* for lack of subject matter jurisdiction. *E.g., Powell v. Powell*, 80 F.3d 464, 466–68 (11th Cir.1996).

analyze these contentions, the relevant framework of analysis must first be established.

In considering the effect of the *Engle* verdict, or any state court ruling for that matter, this Court is guided by principles of full faith and credit. Although the Constitution's Full Faith and Credit Clause [17] requires that states recognize the judgments of sister states, Congress made this general rule applicable to federal courts by enacting 28 U.S.C. § 1738, which provides:

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State Territory or Possession from which they are taken.

Consequently, "a federal court must give to a state-court judgment the same preclusive effect as would be given the judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). "Indeed, though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so...." *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *accord Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466,

102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) ("Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.") Thus, in the absence of federal law modifying the operation of § 1738, the preclusive effect in federal court of the *Engle* Phase I findings is determined according to Florida law.

Seeing that this Court must apply Florida law in giving effect to the *Engle* Phase I findings, the Court must make a determination of what type of preclusion must be provided—either issue or claim preclusion. To make this choice the Court first looks to the *Engle III* decision where the Florida Supreme Court announced that the Phase I verdict would have "res judicata effect" on future trials. *Engle III*, 945 So.2d at 1269. However, the *Engle III* court also found that "the Phase I jury did not determine whether [Defendants] were liable to anyone." *Id.* at 1263. Defendants argue that upon considering these phrases concomitantly, it is apparent that the Florida Supreme Court intended that the findings function as issue preclusion (or collateral estoppel) in subsequent proceedings. Plaintiffs retort that the *Engle* findings should act as claim preclusion (or res judicata) since the Supreme Court of Florida explicitly used the legal term "res judicata" in its decision.

As a starting point, it is necessary to distinguish these often confused doctrines as their differences are critical. The general rule of claim preclusion (res judicata), to quote Judge Henry Friendly,

---

17. "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws pre-

scribe the Manner in which such Acts, Records, and Proceedings shall be proved and the Effect thereof." U.S. Const., art. IV, § 1.

"is beautifully simple, and ... simply beautiful." Henry J. Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U. L.Rev. 383, 422 (1964). Under claim preclusion, a valid and final judgment [18] is conclusive between the parties, except on appeal or other direct review, as follows: (1) a judgment for the plaintiff merges the plaintiff's claim in the judgment and gives him a new claim on the judgment; and (2) a judgment for the defendant operates to bar a second action on the same claim. *Restatement (Second) of Judgments* § 24 (1982); *Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *S. Pac. R. Co. v. United States*, 168 U.S. 1, 48–9, 18 S.Ct. 18, 42 L.Ed. 355 (1897). So stated, the rule is followed in every American jurisdiction, including Florida. *Topps v. State*, 865 So.2d 1253, 1254–55 (Fla.2004) (stating that "doctrine of res judicata bars relitigation in a subsequent cause of action not only of claims raised, but also claims that could have been raised"); *see also Florida Dep't of Transp. v. Juliano*, 801 So.2d 101, 107 (Fla.2001).

By contrast, issue preclusion (collateral estoppel) applies in cases whenever a second action between the same parties is commenced, whether on the same or a different claim, and an issue arises that may have been adjudicated in the first proceeding. Although more complex in formulation, the basic rule is as follows: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action

between the parties, whether on the same or a different claim." *Restatement (Second) Judgments* § 27 (1982); *see also Montana*, 440 U.S. at 153, 99 S.Ct. 970 ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

██ Turning to this case, Plaintiffs contend that this Court need not determine which preclusion doctrine applies because the Florida Supreme Court's announcement that the Phase I findings serve as "res judicata" forecloses the issue. This argument is problematic in several respects. First, as a general proposition, the rendering court, or parallel court system, may not decide the preclusive effect of its own judgments. It is the duty of the second trial court—which knows both what the earlier finding was and how it relates to a later case—to independently determine what preclusive effect a prior judgment may be given. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Souter, J., concurring in part, dissenting in part); *Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406, 409 (7th Cir.1995) ("In the law of preclusion ... the court rendering the first judgment does not get to determine that judgment's effect; the second court is entitled to make its own decision."); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 525 (7th Cir.1985) (Easterbrook, J.) (same); *see* 18 Charles

---

**18.** The term "judgment" is defined as "[a] court's final determination of the rights and obligations of the parties in a case." *Black's Law Dictionary* 846 (7th ed. 1999).

Alan Wright et al., *Federal Practice and Procedure* § 4413 (2d ed. 2002) (noting "general rule that a court cannot dictate preclusion consequences at the time of deciding a first action," except in limited cases where it seeks to *limit* the decision's preclusive effect). Recognizing this principle, Florida courts have required that parties seeking to assert either claim preclusion or issue preclusion as a defense bear the burden of demonstrating that the doctrine applies to the subsequent litigation. *Campbell v. State*, 906 So.2d 293, 295 (Fla. 2d DCA 2004); *State St. Bank & Trust Co. v. Badra*, 765 So.2d 251, 253 (Fla. 4th DCA 2000) (finding that party claiming benefit of res judicata in second proceeding bears the burden of proving that the claim was previously adjudicated); *Meyers v. Shore Indus., Inc.*, 597 So.2d 345, 346 (Fla. 2d DCA 1992) (finding that party asserting collateral estoppel bears burden of demonstrating its applicability).

Second, as acknowledged by the Florida Supreme Court, the Phase I jury verdict did not establish liability as to any Defendant. *Engle III*, 945 So.2d at 1271. Put another way, the Phase I findings did not serve to merge the claims asserted by Plaintiffs into an enforceable judgment, nor are Plaintiffs barred from litigating any particular causes of action in this subsequent suit. In the absence of Plaintiffs' claims being merged into a judgment, the concept of res judicata cannot apply. *See Restatement (Second) of Judgments* § 24 (discussing the requirement that a judgment must be rendered extinguishing the claim before res judicata applies); *see also Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 863 (7th Cir.1996) (defining the concept of "merger and bar" as conterminous with the doctrine of claim preclusion).[19]

■ As such, the only preclusive effect, if any, that can be given the Phase I findings will be provided under the rubric of issue preclusion (or collateral estoppel).[20] Under Florida law, for issue preclusion to apply, five factors must be present:

> (1) an identical issue must have been presented in the prior proceeding; (2) the issue must have been a critical and necessary part of the prior determination; (3) there must have been a full and fair opportunity to litigate that issue; (4) the parties in the two proceedings must be identical; and (5) the issues must have been actually litigated.

*Goodman v. Aldrich & Ramsey Enters.*, 804 So.2d 544, 546–47 (Fla. 2d DCA 2002); *see also Cook v. State*, 921 So.2d 631, 634 (Fla. 2d DCA 2005) (finding that doctrine

**19.** Given the inapplicability of claim preclusion, the *Engle III* court's description of the Phase I findings as "res judicata" must be disregarded as imprecise phrasing—a *lapsus calami*, as it were. Assuredly, the Florida Supreme Court meant to command that the findings be given collateral estoppel effect.

**20.** Technically, the applicable doctrine in this case is "direct estoppel"—a lesser known cousin of collateral estoppel. Whereas the doctrine of collateral estoppel grants preclusive effect in a second action on a *different* claim, *see Allen*, 449 U.S. at 95, 101 S.Ct. 411, direct estoppel grants preclusive effect in a second action on the *same* claim. *See* 18 Charles A. Wright, et al., *Federal Practice and Procedure* § 4418 (2002): *cf. United States v. Shenberg*, 89 F.3d 1461, 1478–79 (11th Cir. 1996) (discussing the difference between "direct" and "collateral" estoppel, noting that issue preclusion principles are the same under both, and using the term "collateral estoppel" in a case involving direct estoppel to avoid confusion). In modern practice, "issue preclusion" is the nomenclature used to describe both "collateral estoppel" and "direct estoppel." Wright, *supra*, at § 4418.

applicable when "same parties" have litigated the "same issues"). This formulation of the doctrine merely expounds upon, without altering, the basic common law requirement that a party must demonstrate that an "identical issue" was "presented in the prior proceedings," and that the issue was "a critical and necessary part of the prior determination." *Goodman*, 804 So.2d at 546–47; *Cf. Montana*, 440 U.S. at 153, 99 S.Ct. 970 (finding that issue preclusion requires showing that identical issue was adjudicated and was essential to prior determination); *Restatement (Second) of Judgments* § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action"). These requirements are quite rigorous and their application is subject to the exercise of broad judicial discretion, as it would be improper to apply issue preclusion in cases where it is impossible to determine what issues were actually decided in prior proceedings. *Hoag v. New Jersey*, 356 U.S. 464, 472, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958) (refusing to apply collateral estoppel in a case where the Court "would have to embark on sheer speculation" to determine what issues were actually decided at trial); *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1197–98 (10th Cir.2000) (finding application of collateral estoppel inappropriate in cases where it is not possible to know compass of jury's findings); *S.E.L. Maduro (Florida), Inc. v. M/V Antonio De Gastaneta*, 833 F.2d 1477, 1483 (11th Cir.1987) ("If the jury

could have premised its verdict on one or more of several issues, then collateral estoppel does not act as a bar to future litigation of the issues."); *Haywood v. Ball*, 634 F.2d 740, 742–43 (4th Cir.1980) (same); *Sun State Roofing Co. v. Cotton States Mut. Ins. Co.*, 400 So.2d 842, 844 (Fla. 2d DCA 1981) (rejecting application of collateral estoppel in cases where it is "impossible to determine which theory the jury relied on" in rendering verdict); *see generally* Wright, *supra*, § 4420 ("if there is no showing as to the issues that were actually decided, there is no issue preclusion").

■ In order to assess what issues were actually decided during the Phase I trial and their effect on future proceedings, the Court must look to the jury's verdict form. *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir.1995). The verdict form submitted to the jury asks ten general questions. These include:[21]

(1) Does smoking cigarettes cause one or more of the following diseases or medical conditions?[22]

(2) Are cigarettes that contain nicotine addictive or dependence producing?

(3) Did one or more of the Defendant Tobacco Companies place cigarettes on the market that were defective and unreasonably dangerous?

(5)(a) Did two or more of the Defendant Tobacco Companies enter into an agreement to conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of

---

21. The *Engle III* court found that two of the ten questions—which were findings of fraud and misrepresentation (questions 4 and 5) and intentional infliction of emotional distress (question 9)—were too nonspecific to give effect. 945 So.2d at 1255. Plaintiffs, accordingly, do not propose to use these findings.

22. The jury form listed a plethora of different illnesses, including kidney cancer, various forms of lung cancer, and stomach cancer.

smoking cigarettes with the intention that smokers and members of the public rely to their detriment?

(6) Did one or more of the Defendant Tobacco Companies sell or supply cigarettes that were defective in that they were not reasonably fit for the uses intended?

(7) Did one or more of the Defendant Tobacco Companies sell or supply cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said Defendant(s), either orally or in writing?

(8) Have plaintiffs proven that one or more of the Defendant Tobacco Companies failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances?

(See Def.'s Ex. 1.) The Phase I jury answered these questions affirmatively, with the exception of finding that smoking did not cause three of the twenty-three medical conditions listed in question one, and concluded that all the Defendants were liable for the tortious acts or omissions described by questions 3, 5(a), 6, 7, and 8. The apparent flaw with the jury form, and any verdict delivered from the form, is its nonspecificity with respect to what acts or omissions committed by what Defendant breached what duty to which Plaintiff causing what injury. As such, this Court "would have to embark on sheer speculation" to determine what issues were actually decided during the Phase I trial and how to apply them to the individual claims before this Court. *Hoag*, 356 U.S. at 472, 78 S.Ct. 829. At most, these findings establish that at some time the Defendants sold a defective product, concealed their tortious behavior, acted negligently, breached an express or implied warranty,

and engaged in a conspiracy to misrepresent information relating to the health effects of smoking. While these findings demonstrate that the Defendants engaged in tortious behavior at some point in the past, such findings are insufficient to establish any element of the Engle plaintiffs' claims. Rather, the Phase I findings merely establish conduct as abroad abstraction, and conduct in the abstract fails to meet the identity requirement to apply such findings in the specific cases before this Court.

Specifically, in order to recover each Plaintiff must demonstrate that his or her illness was caused by smoking, and the injury was proximately caused by the Defendants' misconduct. *See McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 (Fla.1992) (finding that causation inquiry is confined to the "specific, narrow factual details of the case" because the injury inflicted is "proximate in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question"). With this in mind, consider the general Phase I finding concerning negligence. The general verdict form asks simply: "Have plaintiffs proven that one or more of the Defendant Tobacco Companies failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances?" The jury answered "Yes." This, in Plaintiffs' words, denotes that the "Phase I findings conclusively establish that all Defendants were negligent." (Am. Compl. ¶ 67.) However, this is equivalent to saying that the Defendants did something wrong without saying exactly what the Defendants did wrong and when. Did one or more of the Defendants act negligently in 1950, 1951, 1970? Was that specific negligent act the cause of a specific injury to a

specific Plaintiff? In fact, it is impossible to determine what allegations of negligence were presented to the jury, let alone decided in Plaintiffs' favor. This is not to say that the jury's determination that the Defendants were negligent was incorrect; but rather that the Phase I verdict fails to identify which allegation was sustained by the evidence. The Court cannot give preclusive effect to a generalized finding that "Defendants were negligent." *Cf. Dodge*, 203 F.3d at 1197–1201 (concluding in class action involving toxic exposure claims that generalized verdict form stating that defendant "was negligent" was insufficient to satisfy issue preclusion's identicality requirement); *Seaboard Coast Line R.R. Co. v. Indus. Contracting Co.*, 260 So.2d 860, 864–65 (Fla. 4th DCA 1972) (stating that jury finding "in favor of the defendant" could not be given preclusive effect because "it is impossible to ascertain with any reasonable degree of certainty as to what issue was adjudicated in the former suit except to say that the jury found in favor of [defendant]").

Likewise, in support of their strict product liability claims, Plaintiffs rely on the *Engle* Phase I findings as "conclusively establish[ing] that cigarettes sold and placed on the market by Defendants were defective and unreasonably dangerous." (Am. Compl. ¶ 50.) Under Florida law, to recover under the theory of strict liability a plaintiff must demonstrate that the defendant manufactured the product, that the product contains a defect rendering it unreasonably dangerous, and the unreasonably dangerous condition is the proximate cause of the plaintiff's injury. *Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir.1999).[23] Recovery under this theory is dependent on each *Engle* Plaintiff proving that a specific defect in the design of the product he or she used was the proximate cause of the alleged injury. *Cf. In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1081–82 (6th Cir.1996) (finding that class action treatment of strict liability claims against penile implant manufacturer was inappropriate because such analysis must be completed on a product-by-product basis); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 166–67 (S.D.N.Y.2003) (considering the variance of products at issue and stating that "to determine whether the products are defective, the analysis must be completed on a product-by-product basis with consideration of each product's risks, benefits, and costs").

Again, the Phase I findings provide Plaintiffs no assistance. The jury verdict indicates that each Defendant manufactured a defective product at some point in time, yet it fails to specify what defect was supported by the evidence. This makes it impossible to determine whether the unreasonably dangerous defect was present in the cigarettes smoked by a particular plaintiff, let alone the same defective design that was the cause of any alleged injury. *See Emig v. Am. Tobacco Co., Inc.*, 184 F.R.D. 379, 391 (D.Kan.1998) ("Because of the varieties in cigarettes and the variations among class members in terms of what they smoked and when they smoked, there are variations in the elements of each member's claim. Each would have to show that the product he or she used at a particular time was 'defective.'"); *Geiger v. Am. Tobacco Co.*, 277 A.D.2d 420, 716 N.Y.S.2d 108, 109–10 (2000) ("Although each cigarette does contain tar and nicotine, under a strict liability

---

**23.** Florida has adopted the strict products liability standard of the *Restatement (Second) of* Torts § 402A. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla.1976).

theory, each class member would have to establish that the type of cigarettes he or she smoked contained a defect at the time he or she smoked them.") (quotation omitted).[24]

As the foregoing examples illustrate, the Phase I findings fail to establish that the issues tried in the *Engle* Phase I proceeding are identical to the issues presented in this case. Moreover, it is impossible to discern what specific issues were actually decided by the Phase I jury, and what facts and allegations were necessary to its decision; thus this Court is unable to give the Phase I findings preclusive effect with respect to the elements of any of the Engle plaintiffs' claims. *See Goodman*, 804 So.2d at 546–47.[25]

## C.

■ The Defendants also raise a constitutional challenge to Plaintiffs' proposed use of the Phase I findings, arguing that since it is impossible to know what allegations formed the basis of each finding, affording preclusive effect to the general Phase I findings would be an arbitrary application of the common law rules of preclusion. In the Defendants' view, such a fanciful application of well-established

**24.** Plaintiffs strenuously contend that requiring such specificity in a verdict to satisfy the identicality and necessity requirements of issue preclusion, as asserted by the Defendants and as outlined in this opinion, would be "impossible and unworkable" and would "in effect end the doctrine of res judicata." Aside from a basic misunderstanding of the doctrine of res judicata, *see supra* Part II. B, Plaintiffs have touched on the fundamental problem in adjudicating tobacco cases as a class. Indeed, as the *Engle II* court stated: "[i]n the years since initial affirmance of certification [of the Engle class] in 1996, virtually all courts that have addressed the issue have concluded that certification of smokers' cases is unworkable and improper." 853 So.2d at 443–44 (collecting cases). A primary reason for denying certification in such cases is because such claims fail to meet the commonality, typicality and predominance requirements of Federal Rule of Civil Procedure 23(a)(2), (3), or its various state analogues, making them unmanageable, inefficient and fundamentally unfair. The same principles of fundamental fairness militating against certifying such a class equally support this Court's finding that the Phase I verdict may not be used to establish any element of Plaintiffs' claims. Simply put, the Engle class members smoked different tobacco products over different periods of time. They suffer from different illnesses and have incurred different medical expenses, and their treatment will depend on singular circumstances and individual medical histories. These unique circumstances translate into significant legal differences.

Differences in the product used and sufficient nexus between use of the product and injury will require disparate applications of legal rules, including matters of causation, comparative fault, and amount of damages. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 609–10, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (explaining the difficulty, if not impossibility, of certifying long-term mass tort actions, *i.e.*, those that fail to arise out of a single accident); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142–43 (3d Cir.1998) (discussing how individual issues of addiction, causation, the defenses of comparative and contributory negligence prevent cigarette class action certification). And for purposes of issue preclusion, it is the absence of identity of the issues decided in the Phase I proceedings and presented in the instant cases, that prevents the Phase I findings from being afforded preclusive effect in subsequent trials.

**25.** Constitutional issues aside, *see infra* Part III, the Phase I findings may prevent a defendant from arguing, *inter alia*, that it never acted negligently, never engaged in a conspiracy to conceal, or never placed a defective product on the market. In addition, the general findings of Question 1, that cigarette smoking causes various diseases and illnesses and, in a proper circumstance, may be given preclusive effect, prevents the Defendants from denying that cigarette smoking itself has been found to cause, *inter alia*, aortic aneurysm, bladder cancer, coronary heart disease, and lung cancer.

procedural doctrine would violate constitutional guarantees of due process. The Court agrees and—as an additional basis for its decision—finds that application of the Phase I findings as Plaintiffs propose would contravene the dictates of due process.

■ The Supreme Court has consistently held that basic common law procedures serve to protect against arbitrary deprivations of property, and any abrogation or misuse of such procedures raises a presumption of a due process violation. *Honda Motor Co. v. Oberg,* 512 U.S. 415, 430, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994). The traditional common law practice "provides a touchstone for constitutional analysis." *Id.* Basic concepts of preclusion law, claim and issue preclusion, trace their origins to the beginning of the common law. As explained by the Supreme Court in *Stark v. Starr,* 94 U.S. (4 Otto) 477, 24 L.Ed. 276 (1876):

> It is undoubtedly a settled principle that a party is not at liberty to split up his demands and prosecute by piecemeal only a portion of the grounds upon which special relief is sought and leave the rest to be presented in a second suit if the first fails. There would be no end to litigation if such practice were permissible.

*Id.* at 485; *see also United States v. Oppenheimer,* 242 U.S. 85, 87–88, 37 S.Ct. 68, 61 L.Ed. 161 (1916) (citing numerous English common law cases for the proposition that previous adjudication of a matter forecloses further litigation of the matter); Edward W. Cleary, *Res Judicata Reexamined,* 57 Yale L.J. 339, 342–44 (1948). Accordingly, preclusion law's pedigree requires that both state and federal courts exercise caution in applying these doctrines, as "extreme applications" of preclusion law "may be inconsistent with a federal right that is fundamental in character." *Richards v. Jefferson County,* 517 U.S. 793, 797, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996).

In accordance with these principles, the Supreme Court has required that courts not apply the doctrine of issue preclusion to prior determinations unless the court "is certain that the precise fact was determined by the former judgment." *De Sollar v. Hanscome,* 158 U.S. 216, 221, 15 S.Ct. 816, 39 L.Ed. 956 (1895). As the Court in *Russell v. Place,* 94 U.S. 606, 24 L.Ed. 214 (1876), stated:

> It is undoubtedly settled law that a judgment of a court of competent jurisdiction, upon a question directly involved in one suit, is conclusive as to that question in another suit between the same parties. But to this operation of the judgment it must appear, either upon the face of the record or be shown by extrinsic evidence, that the precise question was raised and determined in the former suit. If there be any uncertainty on this head in the record,—as, for example, if it appear that several distinct matters may have been litigated, upon one or more of which the judgment may have passed, without indicating which of them was thus litigated, and upon which the judgment was rendered,—the whole subject-matter of the action will be at large, and open to a new contention. . . .

*Id.* at 608. Again, the Court in *Fayerweather v. Ritch,* 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904), found that a court's providing "unwarranted effect to a judgment" was a deprivation of due process. In this context, the *Fayerweather* Court explained: "where . . . testimony was offered at the prior trial upon several distinct issues, the decision of any one of

which would justify the verdict or judgment, then the conclusion must be that the prior decision is not an adjudication upon any particular issue or issues, and the plea of res judicata must fail." *Id.* at 307, 25 S.Ct. 58.

As the above cases establish, this Court is constitutionally bound to strictly apply the doctrine of issue preclusion consistent with its common law origins. Thus, since it is impossible to determine the precise issues decided by the Phase I jury, with respect to individual claims against particular Defendants, the traditional elements of issue preclusion—*e.g.*, identicality, criticality, and necessity to the prior determination—cannot be satisfied. This Court is accordingly foreclosed from applying the Phase I findings as establishing any part of Plaintiffs' claims.[26] *See Goodman,* 804 So.2d at 546–47. Doing so would comprise an arbitrary deprivation of the Defendants' federal due process rights guaranteed under the Fourteenth Amendment. *See Richards,* 517 U.S. at 797, 116 S.Ct. 1761.

### III.

■ While Defendants correctly argue that affording the Phase I findings the preclusive effect Plaintiffs urge would comprise an independent constitutional violation, Defendants do not argue that *any* application of the findings would be violative of due process on grounds that the

findings as a whole are constitutionally void. However, the issue begs some consideration. While true that the Full Faith and Credit statute requires rigorous obedience, a federal court may not accord preclusive effect to a constitutionally unsound judgment. *Kremer,* 456 U.S. at 482–83, 102 S.Ct. 1883 ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment."). Accordingly, any decision tainted by a violation of due process has no effect and is void. *See id.; McDonald v. Mabee,* 243 U.S. 90, 92, 37 S.Ct. 343, 61 L.Ed. 608 (1917); *Haddock v. Haddock,* 201 U.S. 562, 567–68, 26 S.Ct. 525, 50 L.Ed. 867 (1906). And in evaluating a possible denial of due process, a court must not attempt to confine the right within a rigid blueprint of analysis. *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 610, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Inland Empire Council v. Millis,* 325 U.S. 697, 710, 65 S.Ct. 1316, 89 L.Ed. 1877 (1945). Observing due process as a doctrine of a most dynamic character, Justice Frankfurter remarked, "[d]ue process is, perhaps, the least frozen concept of our law—the least confined to history and the most absorptive of powerful social standards of a progressive society." *Griffin v. Illinois,* 351 U.S. 12, 20–21, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring).

---

**26.** Plaintiffs again argue that the *Rooker–Feldman* doctrine and the Full Faith and Credit statute prevent this Court from considering Defendants' due process challenge. As explained above, *see supra* Part II. A, the *Rooker–Feldman* doctrine does not bar this Court from entertaining Defendants's motion. In addition, the Full Faith and Credit statute is not offended by this Court's holding that the Phase I findings have no preclusive effect in these proceedings, nor is the statute offended by this Court's holding that giving effect to

these findings prospectively would violate fundamental due process. Rather, the Full Faith and Credit statute simply directs this Court to apply the preclusion law of the state of Florida, *see supra* Part II. B, insomuch as Florida's law is consistent with preclusion law's well established common law application. *See Oberg,* 512 U.S. at 430, 114 S.Ct. 2331. Surely, the Full Faith and Credit statute does not mandate this Court to commit an independent constitutional violation. *See Kremer,* 456 U.S. at 482–83, 102 S.Ct. 1883.

Without deciding the issue, there is some question concerning the constitutional validity of the Phase I findings. While many aspects of the sprawling and unwieldy *Engle* trial proceedings are troubling, none are more galling and shocking—in a constitutional sense—than the conduct of Mr. Stanley M. Rosenblatt, Engle class counsel. Relying on the limited record provided the Court, it seems that during the *Engle* Phase I proceedings, Mr. Rosenblatt made numerous racially charged statements and openly advocated jury nullification. The record indicates that at bookends of the Phase I trial he strategically planted the seeds of racial strife and invited the jury to exact "justice" upon the Defendants irrespective of the law, saying: "[L]et's tell the truth about the law, before we get all teary-eyed about the law. Historically, the law has been used as an instrument of oppression and exploitation." [27] The Court takes issue with the propriety and substance of such rhetoric as it propagates and encourages apostasy to the rule of law—the bedrock of democracy.

While true that since the dawn of human civilization and the establishment of the rule of law, many men and women have been confronted with laws they found immoral and unjust leading them to disobey such laws, it is nevertheless universally conceded that such individual moral judgments do not carry the force of legal justification. *See United States v. Moylan*, 417 F.2d 1002, 1008 (4th Cir.1969) (expounding on the history of civil disobedience). It is self-evident that appealing to the subjective moral judgments of jurors while eliding the consequence of law is anathema to ordered society. Toleration of such conduct urges sedition and anarchy and would consign this nation to lawlessness, substituting the force of individual will (brut force) for the force of law (due process). A constitutionally sound verdict must be premised on adherence to the law, and not the caprice of individual moral discretion. Verdicts based on unfettered and subjective notions of "morality" and "justice" "are lawless, a denial of due process and constitute an exercise of erroneously seized power." *United States v. Washington*, 705 F.2d 489, 494 (D.C.Cir.1983): *see also United States v. Trujillo*, 714 F.2d 102, 105–06 (11th Cir.1983).

Nevertheless, the Court is disinclined to adjudge the constitutional integrity of the Phase I findings at this time. As noted above, the issue has not been squarely placed before the Court, nor have the parties been given an opportunity to brief the issue. Moreover, the Court has not had an opportunity to fully review the record and assess the efficacy of any curative measures administered by the trial court. As such, the issue shall be left for another day.[28]

### Conclusion

In summary, the *Engle* Phase I findings may not be used to establish any element

---

27. *See supra* text accompanying note 7.

28. The Court also notes that during the course of oral argument on this motion, Plaintiffs made a plea urging the Court to consider expediency and economy when considering the matter; pointing out that the Plaintiffs in these actions are gravely ill and may very well die before their claims are adjudicated should this Court accept Defendants' argument. Plaintiffs obliquely argue that the greater interests of justice would be served by giving effect to the Phase I findings—implying the Court would work an injustice by not doing so. The Court takes note of Plaintiffs' appeal to emotion, but despite any superficial merit such pleas may offer they have no bearing on this matter—this Court's judgment must be grounded in law. As Justice Holmes once reminded an advocate: "This is a court of law, young man, not a court of justice." *Lawyer's Wit and Wisdom* 152 (Bruce Nash & Allan Zullo eds., 1995); *see also* Oliver Wendell Holmes, Jr., *Letter to*

of an individual *Engle* plaintiff's claim. A general, non-specific finding of tortious conduct on the part of one or more Defendants does not satisfy the requirements of issue preclusion, as the Engle plaintiffs as a whole allege different acts and omissions by different Defendants, breached different tort duties to different people at different times causing different injuries. Additionally, this Court may not, as Plaintiffs urge, stretch the boundaries of preclusion law beyond its understood common law limits in the interests of convenience and economy. Despite any temptation to do so, this Court may not manipulate established procedural and substantive law in the interests of expediting the progress of this litigation.[29] To do so would be to perpetrate an independent constitutional violation. *See In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir.1993) ("considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial" (internal quotation marks omitted)); *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir.1992) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation."). This Court will not sacrifice the fundamental right of due process upon the altars of expediency, thrift, and "pragmatism."

It is **ORDERED**

1. Upon considering Defendant's Rule 16(c) Motion to Determine the Preclusive Effect of the *Engle* Phase I Findings, the Court holds that the findings may not be given preclusive effect in any proceeding to establish any element of an *Engle* Plaintiff's claim. The Court reserves judgment on whether the findings may have any other preclusive effect.

2. At the parties' request, and because the Court finds pursuant to 28 U.S.C. § 1292 that this Order involves a controlling question of law as which there is a substantial ground for difference of opinion, and because this Court is of the opinion that an immediate appeal from the order may materially advance the ultimate termination of the litigation, this Court certifies this Order for interlocutory appeal to the Eleventh Circuit Court of Appeals. Further amplifying the need for an interlocutory appeal is the fact that this decision may require immediate severance of all the tobacco cases—which were originally filed in groupings of 200 [30]—creating approximately 3,400 individual cases, not including the 600 cases that were filed directly in this Court and not involved with those removed from state court.

*C.H. Wu* (July 1, 1929), *reprinted in Justice Holmes to Doctor Wu: An Intimate Correspondence,* 1921–1932, at 53 (1947) ("I have said to my brethren many times that I hate justice, which means that I know if a man begins to talk about that, for one reason or another he is shirking thinking in legal terms.").

**29.** This temptation to defy established legal doctrine in mass actions has been extensively written upon. *See, e.g.,* Jack B. Weinstein,

*Some Thoughts on the "Abusiveness" of Class Actions,* 58 F.R.D. 299, 301–02 (1973).

**30.** At the status hearing held April 4, 2008, Plaintiffs' counsel admitted that the groupings were done at random and with no particular reason other than limiting each case to 200 Plaintiffs.